Filed 5/6/16  In re C.P. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re C.P., a Person Coming Under the Juvenile Court Law. | D068935 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ3763) |
| v. | |
| CHRISTINA P., | |
| Defendant and Appellant. | |


APPEAL from a judgment of the Superior Court of San Diego County,

Gary M. Bubis, Judge.  Affirmed.

Marisa L. D. Conroy, under appointment by the Court of Appeal, for Defendant

and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County

Counsel, and Patrice Plattner-Grainger, Deputy County Counsel, for Plaintiff and

Respondent.

# I.

## INTRODUCTION

Christina P. (Christina) appeals a judgment terminating her parental rights to her minor daughter, C.P. Christina contends (1) that the juvenile court abused its discretion in denying her Welfare and Institutions Code[1] section 388 petition to modify the court's previous order terminating reunification services and (2) that the juvenile court erred by failing to apply the beneficial relationship exception to the termination of parental rights as expressed in section 366.26, subdivision (c)(1)(B)(i). We affirm.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

In early January 2014, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of one-month-old C.P. under section 300, subdivisions (a) and (b). The petition alleged that on December 31, 2013, C.P.'s parents exposed her to the risk of serious physical harm from violent confrontations between them involving the use of physical force (§ 300, subd. (a)). The parents have a history of domestic violence. They had taken C.P. to a New Year's Eve party, at which Christina became visibly inebriated. She and C.P.'s father (Father) engaged in an argument that involved shouting, kicking and hitting. The petition further alleged that C.P. was at substantial risk of serious physical harm as a result of the parents' inability to provide

---

[1]     Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

regular care for her due to mental illness, developmental disability, or substance abuse (*Id.*, subd. (b)).

The event that led to the Agency receiving a referral on January 1, 2014, involved a New Year's Eve party at which both Christina and Father were present, despite the existence of a restraining order against Father, protecting Christina and four of C.P.'s older half siblings.[2] Christina became intoxicated, and while Father was in a Jacuzzi with some female friends, Christina kicked him in the back of the head and then stumbled and fell backward while attempting to back down the Jacuzzi steps, all while holding C.P. in her arms. Someone tried to help Christina get up, but Christina pushed the woman and took a swing at her. The two began to fight. Christina was still holding C.P. Others intervened, and Father took C.P. from Christina and went inside the house.

Christina insisted on leaving the party with C.P. Father left the party on foot, taking C.P. with him. The host would not allow Christina to drive home, so the host's husband and another guest gave her a ride home. Father returned to the party and was provided a ride to his grandmother's home.

The following morning, Father was walking to a store to buy items for C.P. and passed Christina's home. Christina was outside. When she saw Father she said, "[C]ome on, come on," and then approached him and pulled a pocket knife. Father returned to his grandmother's home and called the police. Christina was arrested for assault with a deadly weapon, and Father was arrested for violating the restraining order.

---

[2]     The parents had also been living together, in violation of the restraining order.

In discussing the incident with a social worker, Christina said that she had received a ride home from the party and was awakened at around 4:00 a.m. by Father knocking on her door. Christina was angry with him and told him to go away. She then called the police to report that Father had C.P. The police told her that Father had a right to have C.P. with him. The next thing Christina remembered was being arrested for pulling a knife on Father.

At the detention hearing, the juvenile court made a finding that a prima facie showing had been made with respect to the petition. The court ordered C.P. detained in the approved home of a relative. The court also ordered that Christina and Father be provided reunification services and liberal, though separate, supervised visitation with C.P.

The Agency's detention and jurisdiction/disposition reports indicated that Christina had been the victim of sexual and physical abuse as a child, and began drinking, smoking, and acting out at the age of 13, after her abusive father died. Christina has six children, including C.P. The Agency received four child abuse referrals involving Christina's older children between September 2004 and July 2011; three of the referrals were deemed unfounded or inconclusive. One referral was deemed substantiated. In September 2013, Christina lost custody of her then 4-year-old and 13-year-old children to their father in family court after engaging in domestic violence with C.P.'s father.

After C.P. was removed from Christina's care, Christina participated in voluntary services for substance abuse treatment and resumed therapy, which she had previously attended in 2013. However, Christina admitted that she had violated the restraining order

against Father, and denied having a substance abuse problem, contending that the New Year's Eve incident was an isolated event. However, she later acknowledged being a "binge drinker."

On March 7, 2014, the trial court made a true finding on the section 300 petition. The court set a contested dispositional hearing for the following month. The dispositional hearing was later continued to May 2014.

During this time, Father failed to participate in any services and failed to provide the Agency and/or C.P.'s caregivers with his new address when he moved in March 2014.

On May 16, 2014, the juvenile court ordered C.P. removed from her parents' custody, finding that there is or would be a substantial danger to C.P.'s physical health, safety, protection, or physical or emotional well-being if she were returned home. The court ordered C.P. placed in the home of a relative,[3] and Christina was granted reasonable unsupervised visitation. Christina's case plan required her to participate in a substance abuse treatment program, Narcotics Anonymous (NA)/Alcoholics Anonymous (AA) meetings, random drug testing, a weekly domestic violence support group, individual therapy, and parenting education. Christina was warned that because C.P. was under three years old, she could be limited to six months of services.

With respect to the six-month review hearing, the Agency recommended continuing Christina's services to the 12-month date. At that point in time, Christina had

---

[3]    C.P. was initially placed in the home of a paternal aunt and uncle, but was moved to the home of her paternal grandmother in April 2014, where she has remained throughout this case.

completed a substance abuse treatment program and reported that she was working on step 4 of a 12-step program. However, during September 2014, the social worker made an unannounced visit to Christina's home and observed an alcohol container in the recycling bin outside the home. Christina claimed that the bottle was not hers and said that her neighbors often used her bins. She submitted to a drug test the following day, which came back negative. Because Christina's attendance at AA meetings had decreased between July 2014 and October 2014, the social worker encouraged her to increase her attendance to at least one meeting per week.

Christina was also participating in domestic violence treatment, parenting education, and individual therapy. During this period of time, Christina's visitation with C.P. had progressed to eight hours of unsupervised visits per week.

Christina had indicated to the social worker that she had no desire to resume a relationship with Father. The social worker was concerned, however, that Christina was not being completely forthright. In July and August 2014, C.P.'s paternal grandmother had told the social worker that she suspected that Christina and Father had been having contact, based on conversations she had had with both parties.

At the November 2014 six-month review hearing, Christina requested that the matter be set for trial, and the court set a contested hearing for December 16, 2014.

In a report submitted prior to the contested six-month review hearing, the social worker noted that new concerns had arisen, causing the Agency to recommend that Christina's visits with C.P. be supervised. The social worker reported that on November 6, 2014, the paternal grandmother had told the social worker that at one point in the

weeks prior, she had arrived at Christina's home approximately 30 minutes early. Christina was outside, while C.P. was inside, strapped in a car seat and watching television, and had a very wet diaper. On November 7, the paternal grandmother left a message for the social worker stating that Father had called the paternal grandmother from Christina's home. He said that Christina had invited him over and they were in a fight. The paternal grandmother could hear Christina shouting obscenities in the background. The paternal grandmother believed, based on the way that Christina was speaking, that she had been drinking.

On November 10, the social worker received a " 'calls for service' " log for Christina's address from the San Diego County Sheriff's Department. The log indicated that on June 6, 2014, an anonymous call for service had been made alleging that there were four people at Christina's home, and that two of the people had restraining orders against each other. When an officer arrived at the home, no one answered the door. Another call for service at Christina's address came in on October 18, 2014. On that day, Christina had called and stated that Father had come to her home, and that he had just left. Christina had not reported either incident to the social worker.

On November 12, the paternal grandmother reported that Christina had told her that Father had pulled a knife on her on November 7. The paternal grandmother also reported that Father had told her that he had been seeing C.P. When asked by the social worker about whether Father had been at her home, Christina maintained that he had not been to her home, and denied having told the paternal grandmother that Father had pulled a knife on her.

7

The social worker stated in the addendum report for the contested hearing that "[i]t is concerning to the Agency that [Christina] is able to identify red flags for domestic violence but seems to be pursuing contact with the father."  She also "question[ed] [Christina's] understanding of the protective issues and ability to place the needs and safety of her daughter ahead of her own needs."  Because of these concerns, the Agency filed a section 388 petition requesting a change in Christina's visitation from unsupervised to supervised.

The juvenile court granted the Agency's request to change Christina's visitation to supervised.  In addition, consistent with the Agency's recommendations, the juvenile court terminated reunification services for Father, but continued services for Christina for another six months after finding that she had made substantive progress with the provisions of her case plan.

At the conclusion of the contested hearing on December 16, the social worker provided Christina with a copy of her case plan for the 6- to 12-month review period, as well as a list of the things the social worker wanted to see from Christina in order for her to transition back to unsupervised visits with C.P.  After the hearing, Christina admitted to the social worker that Father had come to her home on October 18, 2014.  Although she had been told to go to the Sheriff's Department with the photograph she had taken of him on her property, Christina had not done so.  She also claimed that she did not know that she was supposed to report the restraining order violation to the social worker.  Christina further admitted that she had allowed Father into her home on November 7, 2014.  Christina said that she had been afraid to tell the social worker.  Christina

8

apologized for not being truthful with the social worker about the incident. Christina and the social worker also discussed Christina's "safety plan," which Christina prepared in October 2014. Christina had not yet followed through with some of the items in the plan.

On December 17, 2014, Christina left the social worker a voice mail stating that Father had been at her home the night before, and that she had called the police. The social worker confirmed with police what Christina had told her.

Christina and the social worker were supposed to meet in January 2015 to go over Christina's case plan. However, Christina did not respond to the social worker's attempts to contact her, and they did not meet in January 2015.

In early January 2015, Christina admitted to her therapist that she had allowed Father into her home on November 7, 2014. She also said that Father had assaulted her that day. She had not called 911 because she thought it would reflect poorly on her case with the Agency. Christina told the therapist that she was staying with a friend because she did not feel safe living in the same mobile home park where Father had been staying with his grandmother. Christina said that she was considering moving from her home and renting it out.

Because Christina had never mentioned the assault to the social worker, the social worker was concerned that Christina was withholding important information from her. When the social worker asked Christina about the November 7, 2014 incident while they

were at court on March 5, 2015, Christina avoided the question. She eventually admitted that Father had assaulted her in November, but declined to provide additional details.[4]

The social worker learned of another incident of domestic violence between Christina and Father that occurred on January 30, 2015. Christina did not immediately report the incident to the social worker, but mentioned it only in response to the social worker's inquiry regarding why she was staying with her sponsor, more than two weeks after the incident.[5] Christina indicated that on January 30, she had been outside on her porch when Father approached her and said that they needed to talk. Christina went into the house to call the police, and Father followed her inside and took the phone from her. Christina believed that Father had been drinking. According to Christina, Father proceeded to choke her six times over a two-hour period. Father threatened to kill her and her family if she " 'snitched.' " Christina escaped when Father let her go to the kitchen to get a drink. She ran out the door to a neighbor's house.

Despite this incident, Christina apparently returned to her home unaccompanied later that day to check her mail and check on her home. Because she believed that Father had taken a spare set of keys, Christina returned another day with her sponsor and her sponsor's husband to change the locks.

---

[4]    Christina eventually admitted that she had sexual intercourse with Father on November 7, 2014.

[5]    Christina had called and told the social worker that she was staying with her sponsor on February 2, but had not indicated her reason for doing so.

In April 2015, the social worker received an update from Christina's therapist. At that point, Christina's target date for completion of her domestic violence goal had been pushed out to June 2015.

The social worker believed that Christina had made some progress in addressing the protective issues. However, she repeatedly failed to be forthcoming with the social worker and made poor choices that could place C.P. at risk of harm. The social worker found Christina's failure to share relevant information "concerning," because Christina "has not demonstrated her ability to keep the Agency informed of situations and then is evasive when asked about situations, which would place [C.P.] at risk for harm if she were placed in [Christina's] care."

At the 12-month review hearing on April 14, 2015, the court determined that returning C.P. to her parents' care would create a substantial risk of detriment to her physical and emotional well-being, and that there was not a substantial probability of returning C.P. to parental custody by the 18-month date. The court determined that the services that had been provided were reasonable, and terminated Christina's reunification services.

On August 26, 2015, approximately four months after the court terminated her services, Christina filed a petition to modify, pursuant to section 388, seeking additional reunification services and that C.P. be placed in her home.

As changed circumstances, the petition cited Christina's completion of outpatient substance abuse treatment, her attendance at AA meetings, participation in group and individual domestic violence treatment, completion of parenting classes, continued

11

treatment by a therapist, the fact that Christina had maintained sobriety for 18 months, and the fact that she had secured safe and confidential housing.

Between June and July 2015, the social worker observed several supervised visits between Christina and C.P. During this time period, Christina had weekly supervised visits with C.P. at the Family Visitation Center. However, she did not call C.P.'s caregivers between visits to ask about C.P. During one visit, the social worker observed C.P. greet Christina with a smile and refer to her as "Mama." Christina brought snacks and toys for C.P., and C.P. frowned as Christina placed her in her car seat at the end of the visit. During another visit, the social worker observed C.P. scream and rush toward Christina, and she put her arms out for Christina to carry her. C.P. played with toys, and did not appear to be distressed at the conclusion of the visit. During a third visit, C.P. repeatedly said, "Nana" and appeared as if she was about to cry. When Christina arrived, C.P. initially walked away from her to continue playing, but Christina managed to get C.P. to play with her. C.P. smiled and kissed Christina goodbye as Christina placed her in her car seat.

The social worker opined in late July 2015 that Christina and C.P. did not share a parent-child relationship. Christina did not call between visits to inquire about how C.P. was doing and she did not provide for C.P.'s daily care or meet her needs. Further, C.P. had been removed from Christina's care when she was less than two months old. The social worker recommended adoption for C.P., and reaffirmed this recommendation in September, prior to the contested section 366.26 hearing.

12

The juvenile court considered Christina's section 388 petition at the section 366.26 hearing on September 16, 2015. Christina was present and represented by counsel. The court received in evidence the Agency's reports, and heard testimony from Christina and Christina's therapist, Rhonda Smallwood. Smallwood had first begun private counseling with Christina in September 2014. At the time Smallwood testified, Christina's counseling was voluntary, not court-ordered.

Smallwood testified that she was aware of the domestic violence altercation between Christina and Father in early November 2014 because Christina had told her about it. She was also aware of a domestic violence incident on January 30, 2015. After that incident, Christina moved out of her home, placed the home for sale, and moved to a new home, keeping her address confidential. According to Smallwood, Christina's actions demonstrated an ability to keep herself safe. Smallwood also indicated that Christina was in a new relationship that was different from her relationship with Father. She appeared to be making progress and had broken her pattern of becoming involved in violent relationships.

Christina testified that she visited C.P. once a week. During the visits, she played learning games and engaged in other activities with C.P. Christina indicated that she had a total of six children, three of whom were still minors. She had unsupervised visitation with her then 5-year-old daughter and then 14-year-old son. Christina told the court that she had completed a 24-week group domestic violence program, as well as substance abuse treatment. She continued to attend AA meetings, worked with a sponsor, and regularly attended individual counseling.

The court determined that Christina had shown changed circumstances, but that she had failed to sufficiently demonstrate that granting the petition would be in C.P.'s best interests.

The court proceeded to the contested section 366.26 hearing. Christina objected to the termination of her parental rights, and contended that the beneficial relationship exception applied. The court followed the Agency's recommendations and concluded that C.P. was adoptable.[6] The court determined that the beneficial relationship exception did not apply and terminated Christina's parental rights.

Christina filed a timely notice of appeal.

## III.

## DISCUSSION

A.    *The juvenile court did not abuse its discretion in denying Christina's section 388 petition*

In her section 388 petition, Christina requested that the court order that C.P. be placed in her care and that she be provided additional reunification services. As changed circumstances, the petition alleged that Christina had made progress in therapy, had achieved 18 months of sobriety, had procured stable and confidential housing, and "demonstrated success even without Agency supervision." Christina supported these allegations with a letter from her therapist discussing her progress. The petition further

---

6    C.P.'s attorney joined with the Agency in requesting the termination of parental rights.

alleged that the proposed modification would be in C.P.'s best interests because there continued to be a strong bond between C.P. and Christina.

Christina asserts that the trial court abused its discretion in denying her section 388 petition requesting that the court modify its April 15, 2015 order in which the court terminated her reunification services. She contends that while the trial court correctly determined that she had demonstrated a sufficient change in circumstances, the trial court acted arbitrarily in failing to conclude that granting her petition would promote C.P.'s best interests.

1. *Legal standards*

Section 388 allows the juvenile court to modify an order if a party establishes, by a preponderance of the evidence, that changed circumstances exist and that the proposed change would promote the child's best interests. (*In re Zachary G.* (1999) 77 Cal.App.4th 799, 806.) To obtain a hearing on a section 388 petition, the parent must make a prima facie showing as to both of these elements. (*Ibid.*; *In re Justice P.* (2004) 123 Cal.App.4th 181, 188.) The petition should be liberally construed in favor of granting a hearing, but "[t]he prima facie requirement is not met unless the facts alleged, if supported by evidence given credit at the hearing, would sustain a favorable decision on the petition." (*In re Zachary G.*, *supra*, at p. 806.) We review the denial of a section 388 petition for abuse of discretion. (*Id.* at p. 808; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413; *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 431, 433.)

In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case. (*In re Justice P.*, *supra*, 123 Cal.App.4th at pp. 188-189.)

2.    *Analysis*

The juvenile court found that Christina had met her burden to demonstrate the existence of changed circumstances. However, the court determined that Christina had not met her burden to demonstrate that the change she proposed would promote C.P.'s best interests. We see no abuse of discretion in the juvenile court's finding that granting the section 388 petition would not be in C.P.'s best interests.

Beyond asserting that placing C.P. with Christina would be in C.P.'s best interests because there exists a "bond" between C.P. and Christina and that C.P. has an "interest in preserving her existing familial unity," Christina offered essentially no evidence that her requested change would be in C.P.'s best interests. Despite Christina's assertion about the existence of a "bond" between her and C.P., the juvenile court was particularly concerned with the fact that C.P. had spent the vast majority of her life in the care and custody of someone other than Christina. Specifically, C.P. had been taken out of Christina's care when she was just 1.5 months old, and thus, "this child has spent 95 percent of her life in the custody of someone other than the mother." The court noted that Christina's contact with C.P. had been limited to "a couple of hours a week for visitation." Given this history, the court was concerned with the magnitude of the change to C.P.'s life that would occur if C.P. were to suddenly be placed in Christina's custody. The trial court

16

agreed with Christina's honest answer that C.P. would likely be "confused" if she were to be placed with her mother "in a strange home."

The trial court was properly concerned with how such an enormous change might impact C.P., who had been in her mother's custody only as a newborn, for less than two months. Christina had supervised visitation during much of C.P.'s life, and saw her only weekly for approximately two hours of visitation during the months leading up to the section 366.26 hearing. Further, Christina did not call to inquire about C.P.'s well-being between visits or try to engage with C.P. Given this history, the court did not abuse its discretion in denying Christina's section 388 petition on the ground that it would not be in C.P.'s best interests to place her in Christina's custody.[7]

_____

[7] Christina asserts that we should apply the factors in *In re Kimberly F.* (1997) 56 Cal.App.4th 519 (*Kimberly F.*) to our best interests analysis. In *Kimberly F.*, the reviewing court stated that the juvenile court should consider the following factors in ruling on a section 388 petition: the seriousness of the problem that led to the dependency, the reason that the problem continued, the ease with which a change of circumstance could be achieved, the nature of any change, the reason a change did not occur sooner, the strength of the parent-child and child-caretaker bonds and the length of time the child has been in the system. (*Kimberly F.*, at pp. 530-532.) A consideration of these factors would not assist Christina. The domestic violence in Christina's relationship with men had resulted in her loss of custody of two older nondependent children and was a serious problem. Christina's contact with the Agency had occurred over a ten-year period. In addition, Christina's substance abuse problems were significant. Further, by the time of the section 388 hearing, C.P. had been in the dependency system for one year and nine months, the vast majority of her life. Christina had received reunification services, and then, after the court terminated the court-mandated reunification services, sought out counseling, participated in group domestic violence treatment, and completed outpatient substance abuse treatment. Christina progressed in her treatment plans. However, during the pendency of the dependency proceeding, Christina had been involved in additional violent episodes with C.P.'s father, and had had other contact with the father as well, which she concealed from the Agency. Further, although C.P. enjoyed her visits with Christina, she was thriving in the care of her paternal grandmother. Thus,

17

B.      *The juvenile court did not err in declining to apply the beneficial relationship exception*

Christina contends that the court should not have terminated her parental rights because of the beneficial nature of her parental relationship with C.P.  (§ 366.26, subd. (c)(1)(A).)  We are not persuaded.

1.      *Legal standards*

If a dependent child is adoptable, the court must terminate parental rights at the section 366.26 hearing unless the parent proves the existence of a statutory exception to adoption.  (*Id.*, subd. (c)(1).)  An exception exists if "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (*Id.*, subd. (c)(1)(B)(i).)  "A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 529.)

With respect to the visitation prong, "[r]egular visitation exists where the parents visit consistently and to the extent permitted by court orders."  (*In re I.R.* (2014) 226 Cal.App.4th 201, 212.)  The lack of regular visitation "fatally undermine[s] any attempt to find the beneficial parental relationship exception."  (*Ibid.*)

This court has interpreted "the 'benefit from continuing the [parent/child] relationship' exception to mean the relationship promotes the well-being of the child *to such a degree as to outweigh the well-being the child would gain in a permanent home with new*, *adoptive parents*.  In other words, the court balances the strength and quality of

---

even under the factors set forth in *Kimberly F*., we would conclude that the trial court did not abuse its discretion in denying Christina's section 388 petition.

18

the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575, italics added.)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*In re Anthony B.* (2015) 239 Cal.App.4th 389, 395.)

2.     *Analysis*

The trial court found that Christina met the first prong of the beneficial relationship exception, acknowledging that Christina consistently visited with C.P., and that the "visits went really, really well." The trial court concluded, however, that Christina failed to establish the second prong of the exception—i.e., that she had a parent-child relationship with C.P. that was so beneficial that terminating her parental rights would be detrimental to C.P. (§ 366.26, subd. (c)(1)(B)(i).)

Specifically, the trial court determined that Christina did not occupy a "parental role" in C.P.'s life. Rather, C.P.'s grandparents occupied that role, and she had spent the great majority of her life in their custody and care. C.P. had frequent and loving contact with Christina, but this was not enough to make that relationship so significant as to outweigh the benefits that C.P. would gain from being adopted.

19

The record supports the trial court's conclusions. It is clear that Christina maintained regular visitation and contact. However, after Christina's visitation was changed to supervised visitation in December 2014, Christina's visitation with C.P. consisted of approximately two hours of supervised visitation per week. Further, the record discloses that between visits, Christina did not inquire of C.P.'s caregivers about her well-being. Further, although C.P. appeared to enjoy her visits with Christina, the social worker was of the opinion that the relationship between Christina and C.P. was not a parent-child relationship. All of this supports the trial court's conclusion that despite the consistent visitation between Christina and C.P., Christina simply did not occupy a *parental* role in C.P.'s life.

There is substantial evidence to support the conclusions that C.P. did not have "a substantial, positive emotional attachment" to Christina of the kind that would outweigh the well-being that C.P. would gain in a permanent, adoptive home, and that she would not be greatly harmed by the severance of the relationship with Mother. (*In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) Therefore, substantial evidence supports the court's finding that Christina did not satisfy the second prong of the beneficial parent-child relationship exception. For these reasons, the juvenile court did not err in concluding that the parental benefit exception to adoption was not applicable. (§ 366.26, subd. (c)(1)(B)(i).)

IV.

DISPOSITION

The judgment is affirmed.

                                                    AARON, J.

WE CONCUR:

BENKE, Acting P. J.

NARES, J.